UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SYLVIA KIRSCHENMAN and LEO KIRSCHENMAN, | ) ) ) | CIV. 09-4190-KES |
| Plaintiffs, | ) ) | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO COMPEL** |
| vs. | ) ) ) | |
| AUTO-OWNERS INSURANCE, | ) ) | [DOCKET NO. 24] |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the court on a complaint by plaintiffs Sylvia and Leo Kirschenman, husband and wife, against Auto-Owners Insurance ("Auto-Owners"), alleging breach of contract, bad faith refusal to pay insurance benefits, and unfair trade practices. See Docket No. 1. Jurisdiction is premised on the diverse citizenship of the parties and an amount in controversy in excess of $75,000. See 28 U.S.C. § 1332.

Pending is plaintiffs' motion to compel Auto-Owners to produce certain discovery which plaintiffs requested. See Docket No. 24. The district court, the Honorable Karen E. Schreier, Chief Judge, referred this motion to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A). See Docket No. 38.

**FACTS**

The facts alleged by plaintiffs are as follows.[1]  Plaintiffs are a husband and wife in their 80s.  They procured property insurance for their home through Auto-Owners.  On May 5, 2007, multiple tornadoes, large hail, and heavy rain struck the area near Gavin's Point dam, just outside of Yankton, South Dakota, where plaintiffs' home is situated.

Plaintiffs' home sustained substantial  damage to its roof.  Heavy rain poured into the attic and continued the pull of gravity downward through the ceiling panels and inside the walls and window wells of the home.  There was a large plastic sheet called a moisture barrier stapled to the rafters in the attic of plaintiffs' home that acted to retard the dissipation of much of the incoming rain water into plaintiffs' home.  The moisture barrier became a large bladder, holding water in the attic and resulting in the saturation of the attic insulation and the rafters.

Following the storm, Auto-Owners hired an independent claims adjustor to estimate the cost of repairing the damage to plaintiffs' home.  Although the adjustor reported to Auto-Owners that the plaintiffs' roof leaked extensively, he never inspected the attic space or checked the insulation.

---

[1]Auto-Owners chose not to assert any facts itself in response to plaintiffs' motion, stating that it "failed to see the relevance of" facts to the present motion.  See Docket No. 30, page 2 n.1.  However, a basic understanding of the allegations being made in this case is necessary to evaluate the discovery requests at issue in their appropriate context.

Auto-Owners issued the plaintiffs a check for $6,909.80 to cover the cost of replacing shingles on the roof and re-painting the interior ceilings.  After these initial repairs were completed, the ceiling panels began sagging in the 23 months after the storm.  Plaintiffs reported the sagging ceiling tiles to Auto-Owners, but Auto-Owners did not respond.

In 2009, plaintiffs began noticing signs of mold growing in their house. Plaintiffs contacted the adjuster with a written list of concerns, including plaintiffs' concern that mold was growing and that the insulation was wet. Auto-Owners again did not inspect the attic or the insulation, but estimated the cost of repainting and stapling ceiling panels, replacing wallpaper, and replacing trim boards to be $7,962.60.

Plaintiffs contacted a contractor, who gave them an estimate of $8,602.78 for the visible necessary repairs.  However, the contractor told plaintiffs that once the ceiling panels were removed, there might be additional repairs required.  The contractor could not be sure what concealed conditions he might find.

In response to plaintiffs' contractor's estimate, Auto-Owners offered to pay plaintiffs the $7,962.60, but conditioned payment on plaintiffs agreeing to release Auto-Owners from any further responsibility in connection with damage from the May 5, 2007, storm.  Plaintiffs refused to sign the release, and so

3

Auto-Owners refused to pay the $7,962.60 that it had determined itself to be owing under the policy.

After attempting to get the South Dakota Division of Insurance and the South Dakota Attorney General's Office to help plaintiffs' with their dispute with Auto-Owners, plaintiffs hired and paid for their contractor's services with their own money.  When the contractor began work, he found extensive mold and mildew throughout the rafters and insulation in plaintiffs' home.

Thereafter, plaintiffs filed their complaint with this court on December 28, 2009.  The instant motion concerns 15 separate document requests that plaintiffs served on Auto-Owners that Auto-Owners either refused to produce documents on, or have limited their production of documents as to.

## DISCUSSION

**A.    Meet and Confer Requirement**

Both the Federal Rules of Civil Procedure and this district's local rules of procedure require that parties meet and confer in an attempt to resolve discovery disputes before filing discovery motions.  See Fed. R. Civ. P. 37(a)(1); DSD LR 37.1.  A certification must be part of any discovery motion and the certification must show that a good-faith effort was made to resolve disputes before filing the motion.  Id.  Plaintiffs' counsel asserted in his original brief in support of his motion that he had complied with both the Federal and local

4

rules requiring the parties to try to work out discovery differences between themselves prior to filing a motion to compel.

Counsel for Auto-Owners asserted in his brief in opposition to this motion that plaintiffs' counsel had not complied with the meet-and-confer requirement. Defense counsel characterized plaintiffs' counsel's efforts as a single letter, which did not specifically tell defense counsel what the disputes were with regard to discovery. Defense counsel accused plaintiffs' counsel of filing this motion nine days later after this single, vague "stab" at trying to resolve the matter.

Plaintiffs' reply brief sets forth the entire course of contacts between their counsel and defense counsel and demonstrates a far different course of events. The process began when plaintiffs served Auto-Owners with discovery requests on April 4, 2010, simultaneously proposing a protective order as to any documents produced in response to the discovery requests. On May 14, 2010, Auto-Owners produced documents in response to five of the 27 discovery requests served on them. Thereafter, over the course of 17 months, plaintiffs' counsel wrote or e-mailed defense counsel 12 times attempting to work out the differences between the parties with regard to the discovery requested by plaintiffs and not provided by Auto-Owners. Plaintiffs' counsel also contacted defense counsel by telephone to attempt to resolve their differences. One of plaintiffs' counsel's letters to defense counsel, at defense counsel's request, was

a seven-page letter itemizing the issues disputed and explaining why they were disputed.  See Docket No. 25-7.

The court notes initially that it is incredible–given this record of contacts by plaintiffs' counsel--that any lawyer could dispute whether plaintiffs had attempted in good faith to resolve this discovery matter prior to filing the instant motion to compel.  The court recognizes that plaintiffs' counsel's contacts were primarily with Mr. Hieb and his legal assistant, Kristen Dinger, and the brief in opposition to the motion to compel was written by Zachary Peterson.  Nevertheless, Rule 11 imposes on every lawyer who puts his signature on a pleading filed with the court the duty to make reasonable inquiry as to the facts.

Mr. Peterson's failure to ascertain the history of communications between plaintiffs' counsel and Mr. Hieb prior to making the assertion that plaintiffs counsel had not complied with the meet-and-confer requirement falls below the standard required by Rule 11.  A simple examination of the correspondence in the Auto-Owners file should have alerted Mr. Peterson to the facts.  A simple reading of plaintiffs' attachments to their motion to compel would also have served to inform Mr. Peterson as many of these contacts between counsel were filed with the court in support of the motion to compel. See Docket No. 25.

Moreover, plaintiffs' reply brief--setting forth the above history of contacts between the parties regarding discovery--was filed in this matter on October 12, 2011.  It is now February, 2012.  Never at any time since plaintiffs' reply brief was filed has Mr. Peterson or any other lawyer on behalf of Auto-Owners retracted their unfounded assertion that plaintiffs' counsel failed to abide by the meet-and-confer requirement.  Plaintiffs counsel has affirmatively demonstrated that he has met the requirements of Fed. R. Civ. P. 37(a)(1) and DSD LR 37.1.  The court will consider plaintiffs' motion on the merits.

**B.      Scope of Discovery in a Civil Case**

The scope of discovery is governed by Fed. R. Civ. P. 26.  The scope described by that rule is as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense–including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

See Fed. R. Civ. P. 26(b)(1).

This scope of discovery under subsection (b)(1) is limited by subsection (b)(2)(C).  That subsection provides that:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
>> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>>
>> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>>
>> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

See Fed. R. Civ. P. 26(b)(2)(C).

A party may move for a protective order from discovery upon a demonstration of good cause in order to protect themselves from annoyance, embarrassment, oppression, or undue burden or expense. See Fed. R. Civ. P. 26(c)(1). If a motion for protective order is denied, the court may order that the party provide or permit discovery. Id. at (c)(2). The court may award attorneys fees and expenses in connection with a motion for protective order. Id. at (c)(3); Fed. R. Civ. P. 37(a)(5).

The scope of discovery under Rule 26(b) is extremely broad. See 8 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2007 (2d ed. 1994) (hereinafter "Wright & Miller"). The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel

8

the other to disgorge whatever facts he has in his possession." 8 Wright &
Miller, § 2007, 96 (quoting Hickman v. Taylor, 329 U.S. 495, 507-08, 67 S. Ct.
385, 392, 91 L. Ed. 2d 451 (1947)).  The Federal Rules distinguish between
discoverability and admissibility of evidence.  Id. at 95; see also Fed. R. Civ. P.
26(b), 32, and 33.  Therefore, the rules of evidence assume the task of keeping
out incompetent, unreliable, or prejudicial evidence at trial.  These
considerations are not inherent barriers to discovery, however.

The advisory committee's note to the 2000 amendments to Rule 26(b)(1)
provide guidance on how courts should define the scope of discovery in a
particular case:

> Under the amended provisions, if there is an objection that
> discovery goes beyond material relevant to the parties' claims or
> defenses, the court would become involved to determine whether
> the discovery is relevant to the claims or defenses and, if not,
> whether good cause exists for authorizing it so long as it is relevant
> to the subject matter of the action.  The good-cause standard
> warranting broader discovery is meant to be flexible.
>
> The Committee intends that the parties and the court focus on the
> actual claims and defenses involved in the action.  The dividing
> line between information relevant to the claims and defenses and
> that relevant only to the subject matter of the action cannot be
> defined with precision.  A variety of types of information not
> directly pertinent to the incident in suit could be relevant to the
> claims or defenses raised in a given action.  For example, other
> incidents of the same type, or involving the same product, could be
> properly discoverable under the revised standard. ... In each case,
> the determination whether such information is discoverable
> because it is relevant to the claims or defenses depends on the
> circumstances of the pending action.

9

> The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. ... When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

See Fed. R. Civ. P. 26(b)(1) advisory committee's note.

The same advisory committee's note further clarifies that information is discoverable only if it is relevant to the claims or defenses of the case or, upon a showing of good cause, to the subject matter of the case.  Id.  "Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings.  Relevancy ... encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' " E.E.O.C. v. Woodmen of the World Life Ins. Society, 2007 WL 1217919 at *1 (D.Neb. March 15, 2007) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).  The party seeking discovery must make a "threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required."  Id. (citing Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1993)).  "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of

10

specificity, the information they hope to obtain and its importance to their case." Id. (citing Cervantes v. Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972)).

Discoverable information itself need not be admissible at trial; rather, "discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence." See Fed. R. Civ. P. 26(b)(1) advisory committee's note.

Once the requesting party has made a threshold showing of relevance, the burden shifts to the party resisting discovery to show specific facts demonstrating that the discovery is not relevant, or how it is overly broad, burdensome, or oppressive. Penford Corp. v. National Union Fire Ins. Co., 265 F.R.D. 430, 433 (N.D. Iowa 2009); St. Paul Reinsurance Co. v. Commercial Financial Corp., 198 F.R.D. 508, 511 (N.D. Iowa 2000). The articulation of mere conclusory objections that something is "overly broad, burdensome, or oppressive," is insufficient to carry the resisting party's burden–that party must make a specific showing of reasons *why* the relevant discovery should not be had. Cincinnati Ins. Co. v. Fine Home Managers, Inc., 2010 WL 2990118, *1 (E.D. Mo. 2010); Burns v. Imagine Films Entertainment, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996).

The plaintiffs' claims in this lawsuit are breach of contract, bad faith refusal to pay insurance benefits, and unfair trade practices, for which she requests both compensatory and punitive damages. To prove a bad faith cause

of action, plaintiffs must show that Auto-Owners had no reasonable basis for denying her insurance benefits, and that they acted with knowledge or a reckless disregard as to the lack of a reasonable basis for the denial of benefits. See Sawyer v. Farm Bureau Mut. Ins. Co., 2000 S.D. 144, ¶ 18, 619 N.W.2d 644, 649.

To prove a *prima facie* breach of contract claim, plaintiffs must show (1) an enforceable promise, (2) a breach of the promise; and (3) resulting damages. Bertelsen v. Allstate Ins. Co., 2011 S.D. 13, ¶ 22, 796 N.W.2d 685, 694 (citing Bowes Constr. v. S.D. Dept. of Transp., 2010 S.D. 99, ¶ 21, 793 N.W.2d 36, 43).

Plaintiffs premise their claim of unfair trade practices on SDCL chapter 58-33. Section 5 of Chapter 58-33 prohibits the making of a misrepresentation as to the provisions of, or benefits available under, an insurance policy. See SDCL § 58-33-5. Section 67 of that chapter, unfair or deceptive insurance company practices are defined to include failing to make a payment of benefits that is reasonably clearly required under the policy in order to obtain a settlement of benefits due under other portions of the policy. See SDCL § 58-33-67(4). Chapter 58-33 provides a private right of action for damages for any insured claiming to have been injured by an insurance company's unfair insurance practice. See SDCL § 58-33-46.1. Claimants suing under this

12

provision are entitled to an award of reasonable attorney's fees if successful.
Id.

Plaintiffs have included a request for punitive damages on their bad faith claim.  To be entitled to an award of punitive damages, plaintiffs must show that Auto-Owners acted with malice, actual or implied.  See Bertelsen v. Allstate Ins. Co., 2011 S.D. 13, ¶ 39, 796 N.W.2d 685, 698-99 (citing SDCL § 21-3-2).  "Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person."  Id. at 699 (quoting Biegler v. American Family Ins. Co., 2001 S.D. 13, ¶ 45, 621 N.W.2d 592, 605).  "By contrast, presumed malice is 'malice which the law infers from or imputes to certain acts.' " Id. (quoting Harter v. Plains Ins. Co., 1998 S.D. 59, ¶ 36, 579 N.W.2d 625, 634). "Presumed malice may not 'be motivated by hatred or ill-will but is present when a person acts willfully or wantonly to the injury of others.' " Id. (quoting Biegler, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605).

Among the factors considered in determining the appropriateness and amount, if any, of punitive damages to award, the degree of reprehensibility of the defendant's conduct is paramount.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003); Roth v. Farner-Bocken Co., 2003 S.D. 80, ¶48, 667 N.W.2d 651, 666.  When considering this factor, one considers whether "the harm caused was physical as opposed to economic; [whether] the

tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident." Roth, 2003 S.D. 80, ¶ 49, 667 N.W.2d at 666 (quoting Campbell, 538 U.S. at 419).  With these legal issues in mind as to plaintiffs' claims, the court turns to the individual discovery requests which are in dispute.

**C.     Individual Discovery Requests**

**1.     Plaintiffs' Request No. 4–Personnel Files**

Plaintiffs' request for the production of documents number 4 reads as follows:

> Request No. 4: Copies of all personnel files of Defendant's employees who handled, reviewed, supervised and/or audited the Plaintiffs' claim, including persons in the chain of command above these individuals up to the head of the claims department.  In order to protect the privacy of the affected employees, Plaintiffs agree that none of these documents shall be used for any purpose outside this lawsuit or disseminated in any way or made available to the public without redacting the names and other identifying information pertaining to the employees.

In response to this request, Auto-Owners eventually produced two personnel files:  that of C.J. Bren, the claim representative who handled plaintiffs' claim; and that of Curt Lundberg, his immediate supervisor.

14

Plaintiffs ask the court to compel Auto-Owners to produce the personnel files of those persons up the chain of command from Lundberg up to the level of the Vice-President or head of claims.  Plaintiffs argue that there are not likely to be more than a handful of persons between Mr. Lundberg and the head of claims, and that upper-level managers and supervisors are the persons who institute company policy with regard to the handling of claims.  Plaintiffs have previously served Auto-Owners with discovery requests seeking simply the names of these persons, but Auto-Owners has refused to identify them or even to state how many of them there are.

Auto-Owners dodges the issue presented by plaintiffs' motion.  It argues in its brief that it has done all that was necessary and that "[p]erhaps a more effective way of going about it would be for the plaintiffs to depose [Bren and Lundberg] to find out if anyone above them ever even had involvement with this claim."  Auto-Owners never represents to the court the names or number of personnel covered by plaintiffs' request number 4 other than Lundberg and Bren.

In a recent discovery dispute in another bad faith action pending in this court, discovery revealed that there were only three persons in the chain of command from the claims representative up to and including a regional claims supervisor:  the claims representative, her immediate supervisor, then the

15

regional claims supervisor.  See Fair v. Royal & Sun Alliance, Civ. No. 11-5005, Docket No. 75, page 22 (DSD Jan. 11, 2012).

Plaintiffs argue that the discovery they request is relevant.  They say that evidence of claims handling procedures, including incentive programs, are more likely to be found in personnel files of managers and supervisors further up the chain of command rather than in the personnel files of low-level claims handlers and their immediate supervisors.  Indeed, in a similar case that came before this court recently, such evidence was in the hands and the personnel file of the regional claims supervisor, not the claims handler or her immediate supervisor.  See Fair, supra, at Docket No. 75, pages 22-23.

Thus, plaintiffs have made their initial showing of the relevance of the discovery they request.  See St. Paul Reinsurance Co., 198 F.R.D. at 511.  The burden then shifts to Auto-Owners to "show specifically how . . . each interrogatory [or request for production] is not relevant or how each question is overly broad, burdensome, or oppressive."  Id. at 512.

Auto-Owners has not done so.  They have not demonstrated specific facts showing an undue burden or irrelevance.  Their response skirts the issue.  Given the likelihood that a small number of personnel files are responsive to plaintiffs' request, and given that plaintiffs agreed from the outset to accord appropriate protections for the confidentiality of those files, the court grants plaintiffs' motion to compel in its entirety as to request number 4.  Auto-

16

Owners is ordered to produce all documents responsive to request number 4.

These documents are to be protected by the parties' stipulated protective order

filed with the court on January 10, 2011.  See Docket Nos. 16, 18.

> **2.    Plaintiffs' Request Nos. 6, 7, and 8–Cost Containment,
> Profitability and Loss Ratios**

Plaintiffs' requests for production of documents numbers 6, 7, and 8 all

have to do with the relationship of claims handling procedures and the "bottom

line" at Auto-Owners.  The requests are as follows:

> Request No. 6:  All documents related to cost containment
> programs or efforts to lower costs with respect to handling of
> property claims since January 1, 2000.

> Request No. 7:  All documents related to efforts to increase
> profitability with respect to handling of property claims since
> January 1, 2000.

> Request No. 8:  All documents related to efforts to reduce loss
> ratios or claims severity costs since January 1, 2000.

Plaintiffs have clarified that what they are seeking in these three requests are

not information about attempts to save money in individual claim files or single

instances, but rather plaintiffs seek documents related to company programs,

campaigns, or initiatives designed to influence employee behavior on a

systematic and wide-spread basis throughout the company.

Plaintiffs assert that the information it seeks is relevant.  Plaintiffs assert

that one of the largest expenses incurred by Auto-Owners in connection with

claims handling is the expense related to investigation of claims.  One of the

allegations of bad faith in this case is that Auto-Owners had a duty to investigate plaintiffs' damage and failed to do so.  Plaintiffs seek information that would tie the actions of Auto-Owners in the handling of their specific claim to a larger company pattern aimed at reducing expenses and increasing profits.

Auto-Owners has produced ten "SOS" video clips in response to these requests, each from five to ten minutes long and each from a different month in the year 2010.  "SOS" is an acronym standing for "simply outstanding service." Plaintiffs assert that the focus of the SOS program is to reduce costs and expenses.  However, Auto-Owners has failed to produce SOS videos from April and July 2010, nor has Auto-Owners produced any SOS videos from any year prior to 2010.

Plaintiffs have learned that Auto-Owners had a program called "REACH," which is an acronym standing for "rewarding employees committed to hard work."  Auto-Owners has produced no documents about the REACH program in response to plaintiffs' discovery requests.

Similarly, plaintiffs have learned of an Auto-Owners initiative called "Strive for Five (Billion)," which plaintiffs believe may be a program related to increasing Auto-Owners' bottom line.  Again, Auto-Owners has produced no documents about the "strive" initiative.

Plaintiffs have also learned of a Customer Satisfaction Team at Auto-Owners whose role has become to reduce expenses.  "Customer" is defined for

purposes of this program to include supervisors of an employee and other company personnel to which an employee answers.  Auto-Owners has produced no documents in regard to the Customer Satisfaction Team.

Plaintiffs have learned that Auto-Owners had set a company goal of achieving a "combined ratio" of 100 percent, but at least six points lower than the industry average, and achieving claims and underwriting expenses that were at least five points lower than the industry average.  In the third quarter of 2007, Auto-Owners announced that its class three associates could earn a bonus of $2,180.70 for achieving the company's goal for the combined loss ratio.  Auto-Owners has produced no documents explaining how these company goals for combined ratio and keeping expenses down were arrived at, how they were communicated to employees, and what programs and incentives may have existed to encourage employees to help the company meet these goals.

Plaintiffs have learned that Auto-Owners told its employees that the loss adjustment expense for the company in May, 2010, was 8.5 percent, and thus that employees were not meeting Auto-Owners' goal of holding loss adjustment expenses to 8 percent or lower.  Loss adjustment expenses are the expenses incurred by Auto-Owners to have an adjuster fix the amount of loss on a claim. Thus, "loss adjustment expense" is inherently tied to the cost of investigating a claim, since investigation is one of the most significant expenses associated

19

with handling a claim.  Auto-Owners has produced no documents in relation to how it set its loss adjustment expense goal, how that goal was communicated to employees, or any programs or incentives designed to motivate employees to help Auto-Owners meet its goal.

In its response, Auto-Owners derides plaintiffs' requests as "laughable" and characterizes plaintiffs as "chasing a rainbow."  Defense counsel's comments do not advance the court's understanding of the issue in any way. And such comments are not in keeping with this court's expectations of civility among counsel–particularly in formal filings with the court.

As to the SOS videos, Auto-Owners represents that there simply was no SOS video produced for the month of April, 2010.  Furthermore, as to July, 2010, Auto-Owners states that a speaker named Joseph A. Michelli, Ph.D. spoke at the home office in lieu of a video.  Auto-Owners agreed to produce the Michelli video after plaintiffs filed the instant motion.

As for SOS videos prior to 2010, Auto-Owners confirms that additional videos exist, but does not want to produce them because what it has is raw, unedited footage complete with outtakes, commentary between the outtakes, and the like.  Auto-Owners never explains why it could not produce the raw footage, or what time and effort might be involved in editing the raw footage so as to replicate the final video product that was presented to its employees originally.

20

Auto-Owners represents that the "strive" program is irrelevant.  It states that the goal of the "strive" program was to motivate employees to sell $5 billion in net written premium.  Hence, "strive" affected Auto-Owners' bottom line on the revenue-producing side of the balance sheet, not the expense side associated with handling and paying claims.

Auto-Owners explains that the REACH program existed in 2007 and was a predecessor or subpart of the SOS program.  However, Auto-Owners asserts that REACH had "almost" nothing to do with property claims.  Notably, Auto-Owners does not assert that REACH had nothing at all to do with property claims.  Furthermore, Auto-Owners does not address the burden involved in producing materials about REACH.  Since Auto-Owners represents to the court that the program was in existence for the year 2007 only, the court surmises that the material cannot be so voluminous as to be overly burdensome to produce.

Auto-Owners resists all of this discovery by representing to the court that its efforts to become more profitable are directed exclusively at increasing sales and premiums and not at all with controlling the cost of handling or paying claims.  This assertion is belied by the few and isolated facts of which the plaintiffs have already learned about how Auto-Owners conducts business.  It is also contrary to common sense and the evidence that has been adduced in any number of bad faith cases litigated in the state and federal courts of South

21

Dakota.  Any business that intends to remain in existence must concern itself with both increasing revenue and keeping costs reined in.

The court reiterates that, once plaintiffs have established the threshold relevance of the discovery they are requesting, the burden shifts to Auto-Owners to make a specific showing of facts from which the court could conclude that the discovery truly is not relevant, or that the relevance is marginal and outweighed by the expense, burden or embarrassment of providing the discovery.  <u>Cincinnati Ins. Co.</u>, 2010 WL 2990118, *1; <u>Penford Corp.</u>, 265 F.R.D. at 433; <u>St. Paul Reinsurance Co.</u>, 198 F.R.D. at 511; <u>Burns</u>, 164 F.R.D. at 593.  Auto-Owners has not carried its burden except as to the "strive" program.

Accordingly, the court will grant plaintiffs' motion to compel Auto-Owners to produce *all* documents responsive to their request numbers 6, 7 and 8.  Auto-Owners is specifically ordered to produce all documents associated with the SOS program prior to the year 2010.  This includes the videos shown to employees, either in unedited form or editing only so as to show the final finished product shown to Auto-Owners employees.  It also includes any information from the Auto-Owners website about the SOS program, including campaign information and monthly activities.  Also included in the court's order is all information about the REACH program and Customer Satisfaction Team materials.  The fact that the court has itemized these particular items

does not relieve Auto-Owners from its duty to respond completely and fully to
plaintiffs' requests number 6-8 as propounded.

### 3.     Plaintiffs' Request No. 9–Bonus and Award Programs

Plaintiffs' request number nine is as follows:

> Request No. 9:  Any and all copies of documents that reference
> bonus or award programs for which the personnel handling,
> reviewing Plaintiffs' claims or supervising those personnel who
> handled or reviewed Plaintiffs' claims, are or have been eligible in
> the past, from January 1, 2002 to the present.  This would include
> the claims handlers, supervisors, managers, or any other
> individuals in the chain of command up to the head of the claims
> department.

In response to this request, Auto-Owners produced documents related to its

Incentive Bonus Plan and gratuitous bonus.  These are bonuses for which

plaintiffs' claims handler, C.J. Bren, and Bren's immediate supervisor, Curt

Lundberg, would potentially have been eligible.

Auto-Owners asserts that it has no duty to produce documents for

programs for bonuses or awards for anyone up the chain of command from

Lundberg.  Auto-Owners asserts that decisions in this district support its

position as no court has ordered upper-level management bonus or awards

programs to be disclosed.  However, this court certainly has ordered discovery

of all bonus or awards programs applicable to any employee under the "claims"

umbrella of an insurer.  See Beyer v. Medico Ins. Grp., 2009 WL 736759, *3

(D.S.D. Mar. 17, 2009).  In the other cases cited by Auto-Owners, it does not

appear to the court that this precise issue was litigated and decided.  Plaintiffs in those cases simply asked for less and got what they asked for.

Plaintiffs seek information about bonuses up the chain of command from Lundberg to the head of Auto-Owners' claims department.  As with the request for personnel files, plaintiffs assert that the behavior of lower-level employees like Lundberg and Bren are shaped by the actions, programs, and goals set for them by those at the top of the company.  The bonuses and awards made available for the top-level employees are typically tied to the ability of those persons to motivate the employees in their charge to achieve company objectives.

Again, Auto-Owners has not asserted that this production would be unduly burdensome or expensive.  It relies on an assertion that such discovery is simply not allowed under the law.  The court disagrees and will grant plaintiffs' request for an order compelling Auto-Owners to respond fully and completely to request number 9 for all bonus and awards which it made available for any person up the chain of command between Lundberg and the head of the claims department.

### 4.    Plaintiffs' Request No. 10–Goals, Targets or Objectives

Plaintiffs' request number 10 is as follows:

Request No. 10:  Any and all copies of documents referring to goals, targets, or objectives from January 1, 2002, to present, which are or have been communicated to claim handlers or supervisory personnel involved with property claims.

24

Auto-Owners has produced in response to this request a bi-annual e-mail from its CEO to all employees regarding the status of the bonuses for that year. Auto-Owners represents that these e-mails are the only documents responsive to plaintiffs' request number 10.  Plaintiffs suspect that there are more, as does the court.

Nevertheless, Auto-Owners cannot be ordered to produce documents that do not exist and, unlike some of plaintiffs' other requests, there are no concrete indications of the nature of other documents, if they do exist.  So that both parties are clear, the court does grant plaintiffs' request for an order compelling Auto-Owners to produce all documents responsive to request number 10, whether those documents are known now, or become known in the future.  In addition, the court directs Auto-Owners to immediately make a reasonable and thorough inquiry along these lines in an attempt to discover such documents.

### 5.    Request No. 13–Training Materials and Claim Guides

Plaintiffs' request number 13 is as follows:

Request No. 13:  Any and all documents, including video presentations, power point presentations, manuals, computer presentations, bulletins, guidelines, or anything else, used to train or assist Defendant's property claims personnel in processing claims.  This request is limited to documents created since January 1, 2002, to the present.  It includes but is not limited to information available on-line.

In response to this request, Auto-Owners produced only a copy of its most recent training manual, claiming that prior versions of the training manual did not exist.

When plaintiffs filed the instant motion to compel, they listed numerous examples of sources of training materials that they knew about, but for which Auto-Owners had not produced documents relative to. Auto-Owners gratuitously responded by casting aspersions on plaintiffs' pre-motion attempt to resolve discovery disputes (calling them "so-called"), and then stated that it would produce additional materials.

Auto-Owners responds, in part, by also asserting that *some* of the materials are licensed, that *some* of the materials are only forms, and that *some* of the training is permissive for employees, not mandatory. This merely skirts the issue. If there are *some* materials that Auto-Owners uses to train its claims employees, then they are relevant. It is then up to Auto-Owners to establish grounds for prohibiting discovery of relevant documents. These vague and partial allegations are not sufficient. For example, as to the licensed materials, Auto-Owners has not shown that it may not allow plaintiffs to inspect those materials. As to the on-line materials, Auto-Owners has not shown why it is not capable of producing those documents which are not "forms" or even that the "forms" are in fact irrelevant.

Again, so that both parties are clear, the court orders Auto-Owners to respond fully and completely to plaintiffs' request number 13.  Auto-Owners shall immediately make reasonable and thorough efforts to identify documents responsive to plaintiffs' request and to supplement its response if additional documents become known at a later date.

**6.  Plaintiffs' Request No. 14—Company Newsletters**

Plaintiffs' request number 14 is as follows:

Request No. 14:  Any and all company newsletters designed to inform Defendant's employees of news or developments since January 1, 2002.

In response to this request, Auto-Owners produced copies of its company newsletters for the years from 2008 through 2010.  Although Auto-Owners does not state so explicitly, the court surmises from Mr. Bayless's affidavit on behalf of the company that these more-recent newsletters were kept in electronic form.

However, plaintiffs' claim arose in May, 2007, and plaintiffs want the remaining newsletters responsive to their request for the years 2005 through 2007.[2]  The newsletters already produced are approximately 60 pages in length and were published monthly.  Plaintiffs estimate the number of pages of the unproduced newsletters to be approximately 2,160 pages.

---

[2]Plaintiffs originally requested newsletters back to the year 2002, but revised their request in their reply brief to go back only as far as 2005.

Auto-Owners responds by stating that it has made the older newsletters available to plaintiffs for inspection in their present location in Lansing, Michigan.  But Auto-Owners refuses to make copies and provide copies to plaintiffs.  Auto-Owners asserts that "it would be incredibly burdensome for Auto-Owners to make copies of these documents, given the manner in which they are stored and the sheer volume associated with the request."  No details, however, are given regarding the way in which the newsletters are stored. Auto-Owners has not disputed factually plaintiffs' estimate of the number of pages involved.

Plaintiffs respond that they will be willing to hire a copy service from Lansing to go to Auto-Owners and make the requisite copies, but asks the court to order Auto-Owners to pay for the discovery.  Plaintiffs quote Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358 (1978), for the proposition that "the presumption [under federal rules of discovery] is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense.'"  See also Rundus v. City of Dallas, 634 F.3d 309, 315-16 (5th Cir. 2011) (quoting the passage from Oppenheimer and stating that "appellees concede that parties must bear their own costs initially when actually responding to discovery").

However, even though that is the presumption, courts have discretion to shift all or part of the costs of production to the requesting party.  Peskoff v. Faber, 251 F.R.D. 59, 61 (D.D.C. 2008); Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318 (S.D.N.Y. 2003).  Costs for producing documents are to be shifted only when an "undue burden or expense" is imposed on the responding party.  Zubulake, 217 F.R.D. at 318.  Whether the burden or expense of producing the discovery is "undue" is determined by considering whether it "outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  Id.

Here, Auto-Owners has simply not show sufficient, specific facts to show that the burden or expense of producing copies of the newsletters is undue, and it is Auto-Owners' job to show such facts.  Furthermore, Auto-Owners can be presumed to have vastly more resources than two elderly people living lives of modest means in rural South Dakota.  Finally, plaintiffs' brief in support of their motion to compel is sprinkled throughout with references to relevant information gleaned from the limited newsletters produced thus far by Auto-Owners.  From this, the court may infer that the un-produced newsletters are important to the issues at stake in this litigation.

Considering all the facts, the court orders Auto-Owners to make copies of the requested newsletters for the years from January 1, 2005, through December 31, 2007.  The employee time expended in the making of such copies shall not be chargeable to plaintiffs.  However, Auto-Owners may charge plaintiffs ten cents per copy for all the pages copied.  Plaintiffs may make their own arrangements for having the copies picked up and shipped to them, or plaintiffs may allow Auto-Owners to arrange for shipping and then reimburse Auto-Owners for that expense.

### 7.    Plaintiffs' Request No. 16–Speeches and Presentations

Plaintiffs' request number 16 is as follows:

Request No. 16:  Any and all transcripts and recordings of speeches or presentations in any form whatsoever, including power point presentation materials, overheads, slides, made by any of the following on the subject of insurance coverage, or the business of insurance:
      a.     Executive officers of Defendant; and
      b.     Claims officers, including Claims Vice Presidents, of the Defendant.
      c.     In-house legal counsel.

In response to this request, Auto-Owners provided the previously-discussed SOS videos for the year 2010.  Auto-Owners represents that it has no centralized library collecting these materials.

Auto-Owners' response again skirts the issue.  The issue posed by plaintiffs' request is whether such documents exist and can be produced.  Auto-Owners never asserts that the documents doe not exist or cannot be

30

produced.  It never informs the court of the facts with regard to the efforts that might be necessary to carry out this production.

The court grants plaintiffs' request as to number 16.  At a minimum, and in accordance with the court's prior resolution of request numbers 6, 7, and 8, Auto-Owners is ordered to produce earlier years of the SOS videos.  In addition, Auto-Owners is ordered to make inquiry to its executive officers, claims officers, in-house legal counsel, Education and Training Department, and the employees or independent contractors who operate recording equipment at company events to find out if there are any other such documents which are responsive to request number 16.  If additional documents are discovered, Auto-Owners is ordered to produce them.

### 8.    Plaintiffs' Request Nos. 17 and 18–Other Litigation and Transcripts

Plaintiffs' request numbers 17 and 18 concern other bad faith litigation against Auto-Owners and are stated as follows:

> Request No. 17:  Any and all documents that identify litigation involving claims of breach of contract, fraud, or bad faith against the Defendant arising out of property and casualty claims.  This information is to be provided from January 1, 2000 to present.

> Request No. 18:  Any and all transcripts of depositions or trial testimony of any of Defendant's employees or officers since January 1, 2000, in any suit alleging breach of contract, fraud, or bad faith in a case arising out of a property and casualty claim.

In response to this request, Auto-Owners identified for plaintiffs one other South Dakota claim for bad faith and gave plaintiffs the caption and civil filing

31

number of this claim.  Auto-Owners also provided plaintiffs with a list of 66 other weather-related property and casualty claims that also involved a bad faith lawsuit.  The information provided includes the insured's name and a brief description of the loss.  Auto-Owners disputes the relevancy of providing any other data because it asserts that there is no nexus between the handling of plaintiffs' claim and the allegations in any of these other bad faith lawsuits.

Plaintiffs persevere in their request for both categories of documents. They point out that Auto-Owners' description of each of the 67 cases is insufficient to determine whether a factual nexus exists between their claim and the bad faith claims made in these other cases.  For example, some of the representative descriptions provided by Auto-Owners are:  "pipe froze moved people out now water everywhere"; "due to storm six acres of netting for pheasants was ripped"; and "tornado took roof off building and damaged several other things."

Plaintiffs are not looking for other claims involving a damaged roof and a water barrier that exacerbated the water retention in their attic.  They are looking for other cases where the allegations of bad faith against Auto-Owners included:  (1) Auto-Owners withholding benefits under the policy that were clearly due and owing in an attempt to coerce the insured into signing a release for any further benefits in relation to the claim; and (2) Auto-Owners failing to investigate any of the insured's claims in these cases to the detriment of the

32

insured.  The descriptions Auto-Owners provided of these other bad faith cases

does not enable the court or plaintiffs to determine whether those other cases

are similar to plaintiffs.

Whether Auto-Owners has engaged in conduct with other insureds that

is similar to the conduct they are alleged to have engaged in with plaintiffs in

this case is relevant.   Roth, 2003 S.D. 80, ¶ 49, 667 N.W.2d at 666 (quoting

Campbell, 538 U.S. at 419) (one of the factors in determining the

appropriateness and amount of punitive damages to award is "the conduct

involved repeated actions or was an isolated incident; and [whether] the harm

was the result of intentional malice, trickery, or deceit, or mere accident.").

However, neither party has given the court enough information to determine if

there is a nexus between any of the 67 other cases and the plaintiffs' claims

against Auto-Owners here.  Clearly, to be relevant, these other cases must

share some factual or legal vector with the plaintiffs' claims.  Plaintiffs are not

able to provide the information because they do not know, and Auto-Owners

has not shared that information with the court.

Nevertheless, even though Auto-Owners has failed to carry its burden to

show that the requested discovery is *irrelevant*, the court declines to issue a

blanket order requiring–as plaintiffs request–a complete copy of each of the 67

files.  A single litigation file can be voluminous and extend to several bankers'

boxes full of documents.  Accordingly, the court will grant plaintiffs' request to

33

this extent:  Auto-Owners is ordered to produce to plaintiffs a copy of the complaint and answer as to each of the 67 bad faith lawsuits, including any amended complaints and answers thereto.  In addition, if a dispositive motion was filed in any of these cases (a Rule 12(b)(6) motion to dismiss or a motion for summary judgment), defendants shall produce a copy of each of the briefs filed in regard to that dispositive motion, though not the supporting affidavits and other documents.  If necessary, Auto-Owners must obtain these limited initial documents from either its in-house counsel, or from outside counsel who represented Auto-Owners in each of these cases.

After plaintiffs review these limited initial pleadings in all 67 cases, plaintiffs may identify files that they believe have a factual or legal nexus to their own claim in this case and request copies of the entire litigation file as to those related claims.  Auto-Owners shall produce the litigation files requested by plaintiffs in their entirety.  Auto-Owners shall also obtain copies of any transcripts of deposition or trial testimony of its employees or officers in any of the litigation files requested by plaintiffs.  Auto-Owners is ordered to contact counsel who represented it in the prior action, in-house counsel, as well as its officers and employees, in an attempt to obtain copies of these transcripts.

Alternatively, if Auto-Owners still disputes the relevance of these files once plaintiffs have identified the files they wish to have access to, it may request a protection order and submit the complaints, answers, and dispositive

briefs from the files requested by plaintiffs to the court for *in camera* review. The court will then be in a better position to rule on the relevancy of such files to the plaintiffs' claims in this case.

### 9.      Plaintiffs' Request No. 19–Other Claims from the May 5 Storm

Plaintiffs' request number 19 requests as follows:

> Request No. 19:  Any and all documents identifying other policyholders of Defendant who filed hail storm or property loss claims arising from the May 5, 2007 storm near Yankton, South Dakota.

In response to this request, Auto-Owners provided a computer generated report showing 30 claims within the Yankton zip code.

Auto-Owners objects to providing the names and contact information for its policy holders who are represented in the report.  In addition, Auto-Owners describes at length the fact that the report may be incomplete because claims are indexed according to which agent sold the policy of insurance.  Thus, there may be policyholders who suffered property damage in the Yankton area on May 5, 2007, who are not in the report because they bought their policy from an agent not in the Yankton area.

The second argument begs the question as to why the 30 policyholders who *do* show up on the report cannot be identified.  The court notes that there is already an extensive stipulated protective order in place in this case.  That order prevents publication or dissemination of documents provided which are confidential.  As to the 30 policyholders who Auto-Owners has already

35

identified, Auto-Owners is ordered to produce documents responsive to plaintiffs' request number 19.

The court will also order Auto-Owners to pursue any reasonable avenue to identify other policyholders not included in the computer-generated report. If additional policyholders come to light at a later date, Auto-Owners shall disclose those persons as well.

### 10.   Plaintiffs' Request No. 20–Regulatory Complaints

Plaintiffs' request number 20 states as follows:

> Request No. 20:  Any and all documents relating to complaints filed with any State Department of Insurance involving Defendant's handling of property loss insurance coverage since January 1, 2000.  This would include, but not be limited to, complaint registers or logs, complaint files, correspondence to and from the state regulator, and documents showing disposition of the complaint.

In response to this request, Auto-Owners produced documents relating to the South Dakota Division of Insurance complaints regarding property loss insurance coverage.  Auto-Owners objects to producing complaints from outside of South Dakota.

It represents that it "has 4,500 insurance department complaint summaries from all over the country."  <u>See</u> Docket No. 30, page 22.  These complaints do not all involve property or casualty claims, but in order to determine which claims *do* relate to property claims, Auto-Owners asserts that it would have to manually review each claim.  Auto-Owners objects to the

36

discovery of complaints outside South Dakota on the basis that providing it would be unduly burdensome.  Auto-Owners also objects on the basis of relevancy.

The court addresses relevancy first.  States violate the due process clause of the United States Constitution when they punish defendants for conduct that occurred outside their state and which was lawful where it occurred.  Campbell, 538 U.S. at 421-22.  Thus, a plaintiff at a bad faith trial who introduces evidence of the insurance company's conduct outside of his own state, particularly if that out-of-state conduct was legal where it occurred, runs the risk of reversal of a punitive damages verdict on appeal.  Id. Nevertheless, another punitive damages consideration, as discussed above, is whether the insurance company repeated its misdeeds over and over, or whether its conduct in the plaintiffs' case was a mere mistake.  Roth, 2003 S.D. 80, ¶ 49, 667 N.W.2d at 666 (quoting Campbell, 538 U.S. at 419).  Thus, the fact that there may have been other, similar complaints against Auto-Owners in other states is relevant.

The court now turns to Auto-Owners assertion that the discovery is unduly burdensome.  Several courts have determined that where the discovery requests are relevant, the fact that answering them will be burdensome and expensive is not in itself a reason for a court's refusing to order discovery which is otherwise appropriate.  See In re Folding Carton Antitrust Litigation, 83

F.R.D. 260, 265 (N.D. Ill. 1979) (stating that "[b]ecause the interrogatories themselves are relevant, the fact that answers to them will be burdensome and expensive 'is not in itself a reason for refusing to order discovery which is otherwise appropriate' "); Alexander v. Parsons, 75 F.R.D. 536, 539 (W.D. Mich. 1977) (stating that "the mere fact discovery is burdensome . . . is not a sufficient objection to such discovery, providing the information sought is relevant or may lead to the discovery of admissible evidence"); and Burns, 164 F.R.D. at 593 (determining that the fact that answering interrogatories will require the objecting party to expend considerable time, effort, and expense consulting, reviewing, and analyzing huge volumes of documents and information is an insufficient basis for an objection). Moreover, if discovery requests are relevant, the fact that they involve work, which may be time consuming, is not sufficient to render them objectionable. See United States v. Nysco Labs., Inc., 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960)and Rogers v. Tri-State Materials Corp., 51 F.R.D. 234, 245 (N.D. W. Va. 1970) (stating that "[i]nterrogatories, otherwise relevant, are not objectionable and oppressive simply on grounds [that] they may cause the answering party work, research and expense").

The court notes that Auto-Owners does not allege that it has 4,500 separate files. Rather, it states that it has 4,500 "summaries." The obstacle, it

says, to producing those summaries which are responsive to plaintiffs' request is that they are not currently sorted electronically.

As plaintiffs point out, however, Auto-Owners does not assert that *they cannot be sorted.* Plaintiffs suggest that the files can be sorted by various key words or codes. Alternatively, plaintiffs offer to have Auto-Owners produce the entire group of summaries and plaintiffs will sort them. Furthermore, plaintiffs point out that all complaints made to state divisions of insurance are monitored by specified, very limited numbers of employees within the company, usually all in a single department. Furthermore, plaintiffs state that the complaint filed by plaintiffs in this case were produced to plaintiffs by Auto-Owners in electronic format, inferring that the other 4,500 complaints are also stored electronically.

The court will grant plaintiffs request number 20 in its entirety. If Auto-Owners can subject the complaints to an electronic search and limit its production to only those complaints dealing with property claims, it may do so and produce only those complaints answering that description. Otherwise, Auto-Owners may produce the file electronically or otherwise to plaintiffs and take them up on their offer to sort the files themselves.

### 11.   Plaintiffs Request Nos. 22 and 23–Duty of Good Faith and Unfair Claims Practices

Plaintiffs' request numbers 22 and 23 read as follows:

Request No. 22:  All documents related to an insurers duty of good faith or the obligation to avoid bad faith conduct.

Request No. 23: All documents related to unfair claims practices or the rules related to unfair claims practices.

Returning to its "dismissive mode" exhibited in response to earlier portions of plaintiffs' motion to compel, Auto-Owners states "these requests could not be more vague."  Auto-Owners produced its Claims Handling Guide, but says it "is unaware of any other items responsive to these requests at this time."  See Docket No. 30, page 23.

Four and a half months prior to filing their motion to compel, plaintiffs wrote Auto-Owners–at the request of Auto-Owners–to explain what they were looking for in these two requests for documents.  See Docket No. 25-7. Plaintiffs at that time pointed out that Auto-Owners had produced a power point presentation regarding the fair claims practice statutes and claim handling, but that the power point presentation was incomplete.  Id. at 7. From this, plaintiffs told Auto-Owners, they knew that there were other documents which had not been produced discussing Auto-Owners' obligations under fair claims practices laws separate and apart from the Claims Handling Guide.  Id.  Plaintiffs also stated in their letter that documents already

40

produced by Auto-Owners indicate the existence of other responsive documents that had not yet been produced.  Id.

Now, plaintiffs further explain their request.  Plaintiffs explain that the Model Unfair Claim Practices Act is a model act that has been adopted by many states.  Plaintiffs further explain that most insurance companies have a "legal compliance" department or individual whose job is to identify these regulatory requirements and make sure the company is conducting its activities in accordance with the law.

Plaintiffs have also produced a specific document from Auto-Owners stating the following:

> Most states have enacted statutes outlining various requirements for claim handling.  Familiarity with relevant statutes, and conformance with the provisions of the statutes, is important to our service of our customers and the Company's effort to maintain our operations at or above the prescribed expectations.
>
> Each claim branch needs to have appropriate reference material available, and review it regularly.  Recognition of revisions and additions should be a regular part of our routine, and when encountered should be communicated within the Region and to Home Office.
>
> Generally, claims handling statutes include provisions consistent with our own expectations.  Time limitations and other issues vary by state.  The following summary of Claims Practices is for guidance.  Your specific state's requirements should be adhered to, and the basis for specific decisions not outlined here.  In case of contradiction, following your state's statute is the appropriate course.

See Docket No. 34-3 (sealed) (Auto-Owners' document DEF 00229).

From this document, which is apparently disseminated to Auto-Owners employees, it is clear that there is a body of "appropriate reference material" which must be available to Auto-Owners employees, and which Auto-Owners exhorts the employees to "review . . . regularly." Id.  Furthermore, Auto-Owners employees are to maintain this reference material by periodically updating it with additions and revisions as part of the employees' regular routine.  Additions and revisions, when encountered, are to be communicated within the Region and to the Home Office by the employees.  Id.

The court grants plaintiffs' motion to compel Auto-Owners to provide all documents responsive to request numbers 22 and 23.  Many of these documents will have already been covered in connection with other discovery requests ordered as discussed above, such as training materials.  Nevertheless, the court orders compliance with these two requests specifically so that there can be no doubt about Auto-Owners' obligation.  Auto-Owners is ordered to immediately make a reasonable and thorough search for documents responsive to these requests and, at the very least, to produce the "reference material" referred to in their own document BATES stamped DEF 00229.

## CONCLUSION

Good cause appearing, it is hereby

ORDERED that plaintiffs' motion to compel [Docket No. 24] is granted in part and denied in part as more specifically described above.  It is further

ORDERED that plaintiffs shall be entitled to reasonable attorney's fees and costs for bringing this motion to compel.  Plaintiffs shall file an affidavit with proof of service setting forth the time reasonably spent on the present motion, the hourly rate requested for attorney's fees and costs, and any factual matters pertinent to the motion for attorney's fees within twenty-one days of this order.  Auto-Owners shall file any and all objections to the allowance of fees within fourteen calendar days after receipt of service of plaintiffs' motion and affidavit. Auto-Owners may, by counter affidavit, controvert any of the factual matters contained in plaintiffs' motion and may assert any factual matters bearing on the award of attorney's fees.  D.S.D. LR 54.1(C).  Plaintiffs shall have seven days thereafter to file a reply.

## NOTICE TO PARTIES

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  See Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained.  Id.  Failure to file timely objections will result in the

waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require review by the district court.

Dated February 17, 2012.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE